IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 5, 2025 Session

# IN RE CEDRIK C.[1] ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 21A108  Stanley Kweller, Judge**

_____

**No. M2024-00736-COA-R3-PT**

_____

Father appeals the termination of his parental rights.  The trial court found three statutory grounds for termination: abandonment by failure to visit, abandonment by failure to support, and failure to manifest an ability and willingness to assume custody.  The trial court also concluded the termination of Father's parental rights was in the best interest of the child.  Because clear and convincing evidence supports that at least one of the termination grounds exists and that termination is in the child's best interest, we affirm the termination of Father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JEFFREY USMAN, J., delivered the opinion of the court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Michael A. Jones, Murfreesboro, Tennessee, for the appellant, Michael W.

Wende Jane Rutherford, Nashville, Tennessee, for the appellee, Jacquline W.

**OPINION**

I.

In 2018, Joann W. (Mother), who was then in a relationship with Michael W. (Father), gave birth to a daughter M.W.  From a relationship with a previous partner Cedrik C., Mother also had a young son C.C.  In March 2020, the Tennessee Department of Children Services (DCS) learned of Mother's drug use around the children and began an

---

[1] It is the policy of this Court to protect the privacy of children in parental termination cases by avoiding the use of full names.

investigation. Mother had physical custody of M.W. at the time, with Father not being present in M.W.'s life. In April 2020, DCS set up a child and family team meeting via phone. DCS's records indicated that Father agreed to participate in the meeting. Father, however, failed to follow through on participating in the call. In May 2020, DCS filed a dependency and neglect petition and sought to change custody to the maternal grandmother, Jaqueline W. (Grandmother). A summons was issued and served on Father, who failed to appear at the hearing. Following that hearing, the children, both C.C. and M.W., were found to be dependent and neglected, and the children were placed with Grandmother. The matter was transferred to Safe Babies Court. Under the direction of that court, monthly meetings were scheduled. Mother participated in these meetings, but Father did not.

Tragically, on October 3, 2021, Mother died. Two days later, on October 5th, Father filed a petition for custody of M.W. In response, Grandmother and the Guardian ad litem filed a petition for an emergency protective custody order. On October 8th, the Davidson County Circuit Court held a preliminary hearing. Father appeared. Afterward, the trial court entered an order giving Grandmother emergency temporary custody of the children C.C. and M.W. In its order, the trial court stated that it was concerned about pending criminal charges against Father and directed that the "GAL shall work with DCS and the custodian to arrange some supervised visitation for the father." No visitation was scheduled. And on November 1, 2021, the Juvenile Court, after hearing brief testimony, declined to award Father visitation.

On December 10, 2021, Grandmother filed a petition to terminate Father's parental rights to M.W. and to adopt M.W. The petition similarly sought to terminate the parental rights of Cedrik C. as to C.C. and to adopt C.C. Grandmother sought termination based on the grounds of abandonment through failure to support, abandonment through failure to visit, and failure to manifest an ability and willingness to assume custody. Both Father and Cedrik C. were served, but Cedrik C. never responded or participated. Father filed an answer opposing termination of his parental rights and also a counter-petition for custody.

A trial was held on January 30, 2024. At trial, the court heard testimony from Grandmother, Mother's sister Marjeniece H. (Aunt), and Father. Grandmother testified that after April 2020, when the children entered her care, Father never contacted her about visitation or to provide support, including the four months preceding the filing of the petition to terminate. She also testified that the children were happy and doing well in her care. She stated that she had a stable job and a safe home for them to live in. She often took the children on what she called "grandma trips," going out to eat seafood, going to bounce houses, and various fun outings. She testified that C.C. and M.W. love each other and are protective of each other. Grandmother testified that Mother had told her about Father having abused her, and noted a particular occasion where Mother came to Grandmother's house with a black eye that Mother said was caused by Father. Grandmother indicated that Father had used illegal drugs with Mother. Grandmother

- 2 -

testified that Father had previously texted her at the same phone number she still had, so she believed him to still have a way to contact her. She confirmed that the contact phone number for M.W.'s guardian that Father listed on his custody petition was, in fact, Grandmother's correct number. The trial court found Grandmother's testimony to be credible.

Aunt testified about a particular incident on May 21, 2019, when she was staying at Mother's home. On this occasion, Aunt, Mother, and M.W. were sleeping in Mother's room, and Father's mother was sleeping on the couch, when Father kicked the door in, came into the bedroom, and started throwing flour, cleaning solution, and syrup on Aunt, Mother, and M.W. Father's mother attempted to stop him, and he tossed her across the room onto a couch before leaving. Later that day, upon return home from an outing, Aunt discovered that Mother's home had been burned down. Aunt suggested Father was responsible. Father was arrested for arson, though it appears from the record that these charges may have been dismissed. The trial court found Aunt's testimony to be credible.

In his testimony, Father stated that he and Mother lived together when M.W. was born, but they broke up around the time of the arson incident. He testified that it was actually Mother's brother who burned the house down and that he had been framed. Father testified that he did not know that Mother was addicted to drugs. Father stated that DCS never notified him about the dependency and neglect proceedings, which contradicted the DCS records. When asked if anyone from DCS had ever contacted him, Father said no. He asserted that the DCS records indicating repeated attempts to contact and engage with Father were lies. In discussing the dependency and neglect action and Safe Babies Court hearings, Father stated that the State's attorney had lied about contacting him, but he did not provide a clear answer as to whether he knew of the hearings. Father denied having engaged in any criminal activity. Father did concede though that he had pled guilty to felony and misdemeanor drug possession charges in March 2023 related to a 2021 arrest. Father was sentenced to two years of supervised probation. Father also conceded that he was convicted of another drug possession charge in Arizona. Father disclaimed any sense of culpability related to his criminal convictions. When asked if he ever paid any monthly child support payments, he stated, "I went and put myself on child support and they said I didn't have to pay." In response to questions about this purported attempt to pay child support, Father could not provide any details about when this occurred, where he went, or who he spoke to. Father indicated that it was the burden of the court to know this information, stating that the trial court could "go verify that easily" because that's the court's "ball game."

During the course of Father's testimony, the trial court became concerned about Father's repeated failure to answer questions directly. Accordingly, the trial court instructed Father's counsel to take a five-minute break to instruct Father on how to answer questions directly. After this break, Father admitted that he had not paid any child support from April 2020 to the date of the trial in 2024, including the four months preceding the

petition.  He also admitted that he had not seen M.W. since she was an infant and that he had never contacted Grandmother to ask to visit the child.  When asked if he had a suitable home for M.W. to live in if he were to gain custody, he stated that he owned multiple homes and he had prepared a bedroom for her in his primary residence in Mississippi.  As for employment, he stated that he owned his own business in the trucking industry.  He said he made approximately $13,000 per month, which would equate to $156,000 per year.  He said his tax documents would show that he made $80,000, however.  Father offered no explanation for the discrepancy.  Noting what the trial court found to be Father's evasive and inconsistent answers, the trial court determined that Father was not credible and gave his testimony little weight.

In its final order, the trial court made detailed findings of fact and conclusions of law.  Regarding the statutory grounds for termination, the trial court found by clear and convincing evidence that Grandmother proved three grounds for termination: (1) abandonment by failure to support, (2) abandonment by failure to visit, and (3) failure to manifest an ability and willingness to assume custody.

With regard to abandonment by failure to support, the trial court noted that it was undisputed that Father "did not provide any financial support for M.W. in the four (4) months immediately preceding the filing of the petition to terminate his parental rights . . . ."  The trial court observed that Grandmother had testified to this and that Father conceded as much.  The trial court found Father's testimony regarding "some unspecified point in time [when] he attempted to pay child support . . . but someone told him he did not need to pay child support" to not be credible.  The trial court also observed that from April 2020, when Grandmother obtained custody of M.W., to the date of trial, Father had not offered to pay any support for the care of M.W.  The trial court also concluded that Father "did not give M.W. a Christmas gift, birthday gift or a single item to meet her basic needs from April 2020 to the present, including the four months prior to the petition being filed."  Noting Father's income, the trial court found that Father "had the ability to support his child and knew or should have known he had an obligation to support his child, yet he willfully chose not to do so."

With regard to abandonment by failure to visit, the trial court noted that it was undisputed that Father "did not visit M.W. in the four (4) consecutive months immediately preceding the filing of the petition to terminate his parental rights."  The trial court observed that Grandmother and Father had testified to this fact.  The trial court further found that Grandmother had the same phone number for six years and that Father had that phone number, had used that number in the past for other purposes, and failed to arrange either a visit with or support for his child.  The trial court also noted that Father failed to appear in any judicial proceedings in the Safe Babies Court.  The trial court found unconvincing Father's assertions that he had not been contacted or kept informed by DCS.  The trial court concluded that Father had not become involved.  The trial court determined that Father, between April 2020 and October 3, 2021 "never contacted [Grandmother] to see M.W.,

never contacted DCS to see M.W., never filed anything with any court requesting parenting time with M.W. or to set support, and never appeared in Safe Babies court to advocate for his child or assert his parental rights." The trial court also found that "[t]here was no evidence that anything prevented [Father] from doing any of these things during the determinative period or in months prior."

In response to Father's argument that his filing of the petition for custody on October 5, 2021, and attendance at hearings on October 8, 2021, and November 1, 2021, rendered any failure to visit not willful, the trial court made extensive findings of fact in relation to its conclusion that Father's failure to visit was willful. The trial court found that Father's circumstances were unlike the authority cited by Father to support his contention that his abandonment of M.W. was not willful:

> Grandmother did not discourage [Father] from visiting the minor child nor did she decline to accept financial support from [Father] for the child's care or act[] in any manner to thwart [Father's] ability to have a relationship with his child. To the contrary, [Grandmother] testified it was her expectation that a father would reach out to [G]randmother to ask about his child and offer to help. [Father] did not even try to contact [Grandmother.] [Grandmother] was never in a position to deny [Father] visits because he never made an effort to visit or to support his child. [Father]'s choice to ignore his daughter's existence and ignore his obligation to support her was just that – his choice – his voluntary, willful decision to do nothing.
>
> [Father] had three years prior to filing his petition for custody to attempt to assume care and responsibility for M.W., and this Court finds he made absolutely no effort to do so.

The trial court noted that Father did file a petition for custody following Mother's death and relatedly that he appeared at hearings on October 8 and November 1, prior to the filing of the petition to terminate his parental rights. Regarding Father's argument that this rendered his failure to visit not willful, the trial court ultimately found that "[t]he filing of his petition alone is not sufficient for [Father] to claim that he was actively pursuing custody of his child when all his other actions are to the contrary." The trial court also indicated that Father's petition included a request that he be provided with support from M.W.'s guardian and that Father had evaded service of Grandmother's adoption petition for months. The trial court further noted that "[d]uring the six-months between the filing of the petition and the filing of his answer and counter, [Father] never presented himself to this Court to seek custody or parenting time with M.W. [Father] did not take any action to advance adjudication of the termination petition once his custody petition stalled, and he made no efforts to pursue visitation or support in this Court while the petition was pending."

- 5 -

As for the third statutory basis for termination, failure to manifest an ability and willingness to assume custody, the trial court found

> [Father] has not seen M.W. in almost 4 years; he has never provided any support for the child; he has never provided a stable home for the child or manifested any ability and willingness to assume physical, legal or financial responsibility for M.W. The child does not know [Father] and does not have a relationship with him. . . . [Father] has a history of domestic violence involving the child and her biological mother. . . . [T]he Court finds by clear and convincing evidence that placing M.W. in [Father]'s care would pose a substantial risk of harm to the child emotionally, psychologically and potentially physically.

After finding these three grounds for termination, the trial court considered M.W.'s best interest, analyzing each of the factors statutorily set forth in Tennessee Code Annotated section 36-1-113. Focusing largely on Father's absence from M.W.'s life, his failure to provide any financial support, his history of drug convictions, his alleged domestic abuse, and the stability and safety provided by Grandmother, the trial court found that it was in the child's best interest to terminate Father's parental rights.

Father appeals the trial court's termination order. Father argues that because he filed a petition and was actively utilizing the legal process to gain custody, the trial court erred in finding statutory grounds for termination of his parental rights. Father primarily relies upon *In re Chelbie F.* to support his argument. *In re Chelbie F.*, No. M2006-01889-COA-R3PT, 2007 WL 1241252 (Tenn. Ct. App. Apr. 27, 2007). In response, Grandmother argues that *In re Chelbie F.* does not support his argument and, further, that the evidence supported the trial court's conclusions as to all three grounds for termination and the trial court's determination as to M.W.'s best interests. While Father does not challenge the trial court's finding as to the best interest of M.W., we, nevertheless, review the trial court's determination pursuant to the charge given this court under the Tennessee Supreme Court's *Carrington* decision. *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016) (stating "we hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal"); *In re Preston H.*, No. M2022-00786-COA-R3-PT, 2023 WL 6793215, at *16 (Tenn. Ct. App. Oct. 13, 2023), *perm. app. denied* (Jan. 24, 2024) (quoting *In re Aniyah W.*, No. W2021-01369-COA-R3-PT, 2023 WL 2294084, at *6 (Tenn. Ct. App. Mar. 1, 2023)) (indicating that "in parental termination cases in Tennessee 'waiver does not apply in the context of either the grounds for termination or whether termination is in a child's best interest'").

II.

Parents have a fundamental constitutional interest in the care and custody of their

own children.  *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007).  This fundamental interest is "far more precious than any property right."  *In re Carrington H.*, 483 S.W.3d at 522 (quoting *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982)).  "[P]ublic policy strongly favors allowing parents to raise their biological or legal children as they see fit, free from unwarranted governmental interference."  *In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010).  However, a parent's rights are not absolute and may be terminated on clear and convincing evidence that statutory grounds for termination exist and that termination is in the best interest of the child.  Tenn. Code Ann. § 36-1-113(c)(1)-(2); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013).

In a termination of parental rights case, we review a trial court's findings of fact de novo on the record with a presumption of correctness unless the evidence preponderates otherwise.  *In re Bernard T.*, 319 S.W.3d at 596; *see* Tenn. R. App. P. 13(d).  "In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights."  *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d at 596-97).  The grounds for termination and the determination that termination is in M.W.'s best interest must be established by clear and convincing evidence, that is, evidence that "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts" and that "eliminates any serious or substantial doubt about the correctness of these factual findings."  *See In re Bernard T.*, 319 S.W.3d at 596; Tenn. Code Ann. § 36-1-113(c).  "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness."  *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

III.

Here, the trial court found that three grounds for termination were established by clear and convincing evidence: abandonment by failure to support, abandonment by failure to visit, and failure to manifest an ability or willingness to assume custody.  Father argues the trial court erred by finding statutory grounds for termination of his parental rights.  We address each ground for termination below.

A.  Abandonment by Failure to Visit and by Failure to Support

The trial court determined that Grandmother established by clear and convincing evidence that Father abandoned M.W. in two ways: by failing to visit, and by failing to support.  *See* Tenn. Code Ann. § 36-1-113(g)(1) (effective July 1, 2021, to June 30, 2022).[2]

---

[2] *In re J.S.*, No. M2022-00142-COA-R3-PT, 2023 WL 139424, at *6 (Tenn. Ct. App. Jan. 10, 2023) ("This court applies the versions of the parental termination statutes in effect on the date the petition was filed.").

Under the statute, abandonment means:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either *have failed to visit* or *have failed to support* or have failed to make reasonable payments toward the support of the child. . . .

Tenn. Code Ann. § 36-1-102(1)(A)(i) (effective July 1, 2021, to May 8, 2022) (emphasis added).

Under this statute, parents can be found to have abandoned their child if, during the four months immediately preceding the filing of the petition, they "failed to visit" or "failed to support." *Id.* Failure to visit is defined as "the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation. That the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant four-month period." Tenn. Code Ann. § 36-1-102(1)(E). Similarly, failure to support is defined as "the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period." Tenn. Code Ann. § 36-1-102(1)(D). Support must be more than just token support, which is support that "under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B).

Here, it is undisputed that Father failed to visit or provide support in the four months immediately preceding the filing. Father admitted as much in his testimony and does not contest those facts on appeal. The record also supports those determinations by clear and convincing evidence.

In his testimony before the trial court, Father indicated that he had spoken with someone about paying child support and had been told that he did not need to do so. In response to questions, Father could not provide any details regarding this purported attempt to pay child support. Even if we were to assume for purposes of argument that in theory this could be a potential basis for concluding that Father's failure to support was not willful, the trial court found Father not to be credible, in general, and not credible on this matter in particular. "When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" *Kelly v. Kelly,* 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State*

- 8 -

*v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)). In conducting this deferential review, "a trial court's determination of credibility will not be overturned on appeal unless there is clear and convincing evidence to the contrary." *Allstate Ins. Co. v. Tarrant*, 363 S.W.3d 508, 515 (Tenn. 2012). The record provides no basis for concluding that the trial court erred in its credibility assessment.

On appeal, Father focuses upon his contention that, because he was actively pursuing custody of M.W. through his petition for custody at the time that Grandmother filed the termination petition, the trial court could not find him to have abandoned her. Father's argument is based on this court's holding in *In re Chelbie F.* There, the father's parental rights were terminated on the grounds of abandonment for both lack of visitation and a lack of support. *In re Chelbie F.*, 2007 WL 1241252, at *2. The father had, however, filed multiple petitions throughout the preceding years attempting to establish both visitation and a support obligation. *Id.* at *1-2. The father also asserted at trial that the mother and her family had rebuffed his attempts to visit the child and to directly provide financial support. *Id.* at *2. Similarly, he asserted they had "actively tried to conceal [the child's] whereabouts from him." *Id.* On appeal, the court of appeals agreed that the facts showed that the father had not visited or provided support in the relevant four-month period. *Id.* at *5. However, the court explained that the mother had testified that she did not want the father to have any visitation and did not want to accept any financial support. *Id.* at *6. Therefore, because of this and because he "turned to the courts several times" in the years before the termination petition was filed, the court found that the record did not contain clear and convincing evidence that the father had willfully abandoned the child. *Id.* at *6-7 (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)). Father argues that based upon *In re Chelbie F.*, the evidence does not show that Father abandoned M.W. Under his theory, because he had filed for custody, he was utilizing the court system in a similar fashion to the father in *In re Chelbie F.*

In response, Grandmother argues that *In re Chelbie F.* can readily be distinguished from this case. We agree with Grandmother. In *In re Chelbie F.*, the court explained that the father had filed multiple times over several years attempting to establish both visitation and financial support, all while his attempts to visit and provide financial support were thwarted by the mother and her family. *Id.* at *6. Here, in contrast, Father filed for custody, rather than to establish visitation and a financial support obligation. Further, and perhaps in greater contrast, Father does not argue that Grandmother or anyone else ever thwarted or otherwise interfered with any attempts to visit or provide financial support. Rather, the evidence shows that he made no effort to provide either. Grandmother stated that in the many years she had M.W. in her custody, she never once heard from Father even though the record shows that he knew how to contact her. The trial court did not credit Father's assertion that he attempted to establish child support and was told he need not pay. Rather than indicating interference with any attempt to visit or support, the record instead shows that Father had the ability to reach out and ask about visitation and support, but chose not to.

This court has refused to apply *In re Chelbie F.*'s reasoning in situations much like this one, where evidence does not indicate that the parent's attempts to visit or support were interfered with or thwarted in any way. *See, e.g., In re Brookelyn W.*, No. W2014-00850-COA-R3-PT, 2015 WL 1383755, at *18 (Tenn. Ct. App. Mar. 24, 2015) (distinguishing *In re Chelbie F.* where there was no evidence that the mother ever thwarted father's attempts and there was no excuse for his delay in seeking visitation); *In re Mark A.L.*, No. M2013-00737-COA-R3PT, 2013 WL 5536801, at *6 (Tenn. Ct. App. Oct. 4, 2013) (distinguishing *In re Chelbie F.* where there was no evidence that the mother ever interfered with the father's ability to provide support or visit). Therefore, we find Father's argument under *In re Chelbie F.* to be unpersuasive. Because we agree with the trial court that it is undisputed that Father failed to visit or support M.W. in the four months immediately preceding the filing of the termination petition, we affirm the trial court's determination that Father abandoned M.W., both through a lack of visitation and a lack of support. Simply stated, the record provides clear and convincing evidence in support of the trial court's finding of abandonment by failure to support and abandonment by failure to visit.

### B. Failure to Manifest an Ability and Willingness to Assume Custody

As for the third statutory ground for termination ground, the trial court found clear and convincing evidence that Father failed to manifest an ability and willingness to assume custody of M.W. *See* Tenn. Code Ann. § 36-1-113(g)(14). To satisfy this ground, two prongs must be proven by clear and convincing evidence: (1) the parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. *Id.*; *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

The Tennessee Supreme Court has indicated the statute places a "conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *In re Neveah M.*, 614 S.W.3d at 677. Failure of the parent to manifest either ability or willingness will satisfy the first prong. *Id.* "Ability focuses on the parent's lifestyle and circumstances," while willingness revolves around a parent's attempts "to overcome . . . obstacles" preventing the parent from assuming custody. *In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at *6 (Tenn. Ct. App. Feb. 8, 2019). A parent's express desire to reunite with the child is insufficient to establish a willingness to assume custody. *See In re Nicholas C.*, No. E2019-00165-COA-R3-PT, 2019 WL 3074070, at *17 (Tenn. Ct. App. July 15, 2019). To the contrary, "[w]hen evaluating willingness, we look for more than mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). This court instead considers a parent's efforts to

overcome any obstacles standing in the way of assuming custody or financial responsibility. *In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at \*9 (Tenn. Ct. App. Apr. 17, 2019) (quoting *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at \*8 (Tenn. Ct. App. Mar. 22, 2019)). A failure to make efforts to overcome such obstacles "can undercut a claim of willingness." *Id.* As for the second prong, a substantial risk of harm requires "a real hazard or danger that is not minor, trivial, or insignificant" and requires the harm to be more than a "theoretical possibility" to be "sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001); *see In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at \*8 (Tenn. Ct. App. Apr. 4, 2018).

Here, the trial court found Father had failed to manifest an ability and willingness to assume custody based on Father having never provided a stable home and having never taken any financial responsibility for M.W. Further, the trial court stated that Father had no relationship with M.W. whatsoever, having not seen her in over four years. The trial court also noted that Father had a history of domestic violence involving both M.W. and Mother. Related to its concerns regarding this statutory ground for termination, the trial court also made findings as to Father's criminal activity. The trial court noted Father's convictions in connection with "transporting a large amount of marijuana in the trunk of a vehicle." Also, the trial court noted a conviction in November 2022 in Madison County, Tennessee, on two counts of felony possession with intent to sell and for one count of possession of drug paraphernalia. The court observed that Father was "on probation for drugs in more than one state." The trial court concluded that Father's continuing criminal behavior after having previously completed probation "indicates he did not make a lasting change regarding his criminal activity." This raised serious concerns for the court about Father's lack of ability "to safely and consistently care for M.W. or provide her with a stable home." Ultimately, the trial court found that placing M.W. in Father's care would pose a substantial risk of harm and Father had failed to manifest an ability and willingness to assume custody under Tennessee Code Annotated section 36-1-113(g)(14).

On appeal, Father argues that the record does not support the trial court's conclusion that Grandmother proved this ground by clear and convincing evidence. He points to his testimony about owning a home for M.W. to live in with a room already set up for her. However, the trial court found Father's testimony to be lacking in credibility. As noted above, "[w]hen it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" *Kelly,* 445 S.W.3d at 692 (quoting *Binette*, 33 S.W.3d at 217). In conducting this deferential review, "a trial court's determination of credibility will not be overturned on appeal unless there is clear and convincing evidence to the contrary." *Allstate Ins. Co.*, 363 S.W.3d at 515. There is no basis for unsettling the trial court's determination based upon this record; therefore, we defer to the trial court's determination

that Father's unverified statements in court were not credible. *See In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023) (citing *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002)) (indicating "we defer to a trial court's credibility determination about the parents' testimony").

Beyond the determination of credibility, the record supports by clear and convincing evidence the trial court's finding of Father's lack of ability and willingness to assume custody. The record shows that even if Father had a home and stable income at the time of the trial, he had done nothing to provide for M.W. despite having had an ability to support. Until filing his petition for custody, Father had never indicated any intention to assume physical custody or financial responsibility. Father admitted that he had never reached out to Grandmother in an attempt to provide any financial or parental support to M.W. The record also reflects Father engaged in continuing criminal activity and failed to demonstrate a successful departure from such conduct.

Moving to the second prong, the trial court focused on Father's complete lack of a relationship with M.W. and the harm it would pose to her if she were to be returned to his custody after living so long with Grandmother, with whom she has a great relationship. This court has regularly noted the risk of serious harm to children caused by reuniting them with a parent they do not know. *See, e.g.*, *In re Royalty Y.*, No. W2023-01333-COA-R3-PT, 2024 WL 2042496, at *7 (Tenn. Ct. App. May 8, 2024) (upholding determination of substantial psychological harm based upon concern about reuniting parent with a child who did not have a meaningful relationship with the parent and where the child was bonded with foster parents who wished to adopt); *In re Kaitlyn D.*, No. M2023-00658-COA-R3-PT, 2024 WL 1049483, at *14 (Tenn. Ct. App. Mar. 11, 2024) (upholding determination of substantial psychological harm based upon reuniting parent with child who did not have a meaningful relationship with the parent and where the child was bonded with another caregiver who wished to adopt); *In re Chance B.*, No. M2023-00279-COA-R3-PT, 2024 WL 764015, at *10 (Tenn. Ct. App. Feb. 26, 2024), *perm. app. denied* (Tenn. May 23, 2024) (noting a serious psychological harm from reuniting children with a parent with whom they have no relationship). We conclude the record provides clear and convincing evidence to support the trial court's determination that Father failed to manifest an ability and willingness to assume custody of M.W.

IV.

Having concluded that at least one statutory ground for termination of parental rights has been shown by clear and convincing evidence, our focus shifts to what is in M.W.'s best interest. *See In re Audrey S.*, 182 S.W.3d at 877. The Tennessee Supreme Court has summarized the law regarding the best interest analysis as follows:

> Facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence."

"After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests." When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ."

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017) (citations omitted).

The nonexclusive factors relevant to the best interest analysis are laid out in Tennessee Code Annotated section 36-1-113(i)(1):

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1) (effective July 1, 2021, to June 30, 2022).

The trial court analyzed each of these factors in detail, thoroughly examining the relationship between the facts of the present case and each of the factors. It afforded varying levels of weight to each factor, depending on the relevant facts, but found every factor to weigh in favor of termination. In our review, because many of the factors touch on similar factual predicates and involve similar issues, we group our discussion of the best interest factors "based on the overarching themes within the list" of factors under the circumstances of the case. *In re Chayson D.*, 2023 WL 3451538, at *14.

We consider first M.W.'s emotional needs. *See* Tenn. Code Ann. § 36-1-113(i)(1)(A) (concerning the need for stability), (B) (concerning how changes in caretakers affect child well-being), (D) (concerning parent-child attachment), (E) (concerning visitation), (H) (concerning attachment to others), (I) (concerning relationships with others), (T) (concerning the parent's fitness and its corresponding impacts). We conclude that the trial court properly concluded that these factors support the termination of Father's parental rights. Terminating Father's rights will have little to no effect on M.W.'s need for stability, as Father has been entirely absent from her life since she was an infant. Father does not know her needs and has not provided stability for her. On the contrary, removing M.W. from Grandmother's care would have a great negative impact on her well-being. Grandmother has provided a safe, loving, and stable home. Removing M.W. from the only home she knows and placing her with a stranger would be incredibly detrimental to her. As for attachment between M.W. and Father, the trial court found, and the record supports, that there is none. The court also did not believe that Father to be capable of creating a secure attachment, given Father's past abusive actions toward M.W. and Mother and Father's lack of significant efforts to create such an attachment for the last several years.

- 15 -

Father has not visited with M.W. since she was an infant. M.W. instead has a strong bond with Grandmother, who has filled the role of her parent for many years. She also has a strong and meaningful relationship with her half-brother. The two children have been raised together and love each other. Finally, the record supports the conclusion that Father is unable to provide a safe home, given his abusive and criminal past, coupled with his lack of effort to be involved in M.W.'s life and lack of indication of an enduring change of behavior away from criminal conduct. These factors weigh in favor of termination.

Next, we turn to considerations of M.W.'s physical environment and well-being. *See* Tenn. Code Ann. § 36-1-113(i)(1)(N) (involving any abuse or neglect present in the parent's home), (O) (involving the parent's prior provision of safe and stable care to any child), (Q) (involving the parent's commitment to having a home that meets the child's needs). We agree with the trial court that these factors weigh in favor of the termination of Father's parental rights. The record indicates that Father was violent toward Mother and, on one occasion, as testified to by Aunt, violent toward Aunt, Mother, M.W., and Father's mother. Father has not provided safe or stable care for the child. His criminal and abusive behavior and lack of involvement in M.W.'s life, without indication of an enduring change in behavior, indicate that he will not be able to provide safe and stable care for M.W. Although he testified that he had a room ready for her at his home, the trial court found that testimony not to be credible. These factors weigh in favor of termination.

Next, we consider Father's efforts. *See* Tenn. Code Ann. § 36-1-113(i)(1)(C) (involving the parent's continuity in meeting the child's needs), (J) (involving the parent's lasting adjustment of circumstances, including consideration of criminal activity), (K) (involving the parent's use of available resources), (M) (involving parent's sense of urgency in addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest). We agree with the trial court that these factors weigh in favor of the termination of Father's parental rights. The record shows that Father did not demonstrate any continuity and stability in meeting M.W.'s needs, as he was uninvolved in her life for several years, nor does he know what her needs are. Father also testified that he never committed any crimes or did drugs, despite admitting multiple felony drug convictions. The trial court discounted his testimony, in part because of his inconsistent answers related to his continued criminal behavior. Reflecting on Father's continuing criminal activity, the trial court properly concluded that Father had not made the necessary adjustments to his behavior. Father's lack of involvement or interest in visiting with M.W. until after Mother's death indicates a lack of urgency in seeking custody. The record shows that Father was capable of contacting Grandmother for several years to see M.W., but he did not do so. These factors weigh in favor of termination.

Finally, with regard to support and knowledge of M.W.'s needs, the trial court also found that these factors support termination. Tenn. Code Ann. § 36-1-113(i)(1)(S) (addressing parent providing more than token support); (P) (addressing parent's understanding of the child's needs). We agree with the trial court that these factors weigh

in favor of termination.  Father had not provided any support, or been involved in any way, since M.W. was an infant.  As for Father's testimony that he spoke to someone in an attempt to pay child support, his inability to provide any details and the trial court's credibility finding strongly weigh against the veracity of his claim.  The trial court concluded, and the record supports, that Father did not know M.W., nor did he know anything about her basic needs or what she would need to thrive.

"While determination of the child's best interest may not be reduced to a simple tallying of the factors for and against termination, . . . especially considering the similarities between the factors, we cannot help but acknowledge the overwhelming sense that [M.W.'s] life will not be improved by a reintroduction to [Father]."  *In re Chayson D.*, 2023 WL 3451538, at *15 (citation omitted).  The record supports the trial court's determinations as to the best interest factors.  Furthermore, clear and convincing evidence supports the conclusion that the best interests of M.W. favor terminating Father's parental rights.  Accordingly, we affirm the trial court's termination of Father's parental rights.

V.

In considering the arguments advanced on appeal and for the reasons discussed above, we affirm the judgment of the trial court.  The costs of the appeal are taxed to the appellant, Michael W., for which execution may issue if necessary.  The case is remanded for such further proceedings as may be necessary and consistent with this opinion.

s/ Jeffrey Usman
JEFFREY USMAN, JUDGE